UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON DUCK TOURS, LP,            )<br>                                                   )<br>                       Plaintiff,         )<br>                                                   )<br>            v.                                    )<br>                                                   )<br>SUPER DUCK TOURS, LLC,         )<br>                                                   )<br>                       Defendant.      )<br>                                                   ) | CIVIL ACTION<br>NO. 07-11222-NMG |

**DEFENDANT'S MOTION TO STAY
PRELIMINARY INJUNCTION**

On July 13, 2007, the Court issued a preliminary injunction ("Injunction") restraining Defendant Super Duck Tours, LLC ("SDT") from "using the term 'DUCK TOURS' or a cartoon duck as a trademark or service mark in association with its sightseeing tour service in the greater Boston area." July 13, 2007, Order ("Order") at 16. Concurrent with the filing of this motion, SDT has filed a notice of appeal of the Order, and hereby moves for a stay of the Injunction pending appeal of the Court's Order.[1] In light of the grave risk of irreparable harm from the Court's Order, SDT respectfully requests expedited, emergency consideration and disposition of this Motion. Should the Court deny a stay pending appeal, SDT respectfully requests that the Court at a minimum issue an administrative stay of the Injunction to permit orderly resolution of a motion to stay in the First Circuit.

**STANDARD**

This Court has the inherent power to stay the Injunction. 28 U.S.C. § 1651. More specifically, "[w]hen an appeal is taken from an interlocutory . . . judgment granting . . . an injunction, the court in its discretion may suspend . . . an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party." Fed. R. Civ. P. 62(c). This is, of course, true as well of a request for a stay pending appeal of an injunction in a

---

[1] In further support of this motion, SDT incorporates by reference and relies on its Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and the affidavits and exhibits submitted therewith ("Opposition").

trademark matter. *Devcon Corp. v. Woodhill Chemical Sales Corp.*, 455 F.2d 830, 832 (1st Cir. 1972) (granting stay pending appeal).

In determining whether a stay pending appeal is warranted, the Court generally examines the likelihood of ultimate success and balances the harm between appellant if the stay is not granted with the harm suffered by appellees and the public if the stay were granted. *See Morgan v. Kerrigan*, 509 F.2d 618, 619 (1st Cir. 1975). However, "on motions for stay pending appeal the movant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (citing *Providence Journal v. Federal Bureau of Investigation*, 595 F.2d 889 (1st Cir. 1979) (where there is a showing of immediate and irreparable harm to the party seeking stay pending appeal, that party must merely show "potential merit," not "absolute probability of success"). *See generally Commonwealth v. Levin*, 7 Mass. App. Ct. 501, 504, 388 N.E.2d 1207, 1209 (1979) (a meritorious appeal justifying the issuance of a stay pending appeal "has been held to mean 'one which is worthy of judicial inquiry because raising a question of law deserving some investigation and discussion'"; the issue need only be one "which is worthy of presentation to an appellate court," and "not one of substantial certainty of success") (citations omitted).

SDT's appeal of the Injunction presents a substantial case on the merits, involving a serious legal question and a balance of equities heavily favoring a stay. The Court should stay the injunction pending appeal.

### A. A Stay of the Injunction is Warranted Pending SDT's Appeal.

The Injunction is premised upon the holding that the term "duck tours" is not generic when used for an amphibious land/water tours. Opinion at 11. SDT respectfully suggests that this holding cannot be sustained.

Both Boston Duck Tours ("BDT") and SDT are in the business of providing sightseeing tours by land and water that utilize amphibious vehicles known as "ducks." *See* Affidavit of Dennis Kraez ("Kraez Aff.") at ¶ 2. While the name "duck" originally derived from a special vehicle identification code – DUKW – given to certain amphibious vehicles built by General Motors during World War II,

the term "duck" is now generically used to refer to any amphibious vehicle. *See, e.g.,* Oxford English Reference Dictionary at 434 (2d Ed. Rev. 2002) ("Duck" defined as "an amphibious landing-craft.") (attached as Ex. 4 to Affidavit of Sara Cable ("Cable Aff.")); *see also* Webster's Ninth New Collegiate Dictionary at 387 (1983) ("Duck" defined as "an amphibious truck"); http://en.wikipedia.org/wiki/DUKW ("though technically a misnomer, DUKW's are often referred to as duck boats."). The word "tour," of course, is a generic term for a journey or route around a particular area highlighting points of interest. *See* Oxford English Reference Dictionary at 1523 (2d Ed. Rev. 2002) (defining "tour" as "a journey from place to place as a holiday," or "an excursion, ramble, or walk.") (attached as Ex. 4 to the Cable Aff.).

Not surprisingly, then, the term "duck tour" has become a generic term used by tour companies around the country (and the world) and in the marketplace to describe a particular type of tour; *i.e.* a tour using a vehicle that is specially-made to operate on land and water. While BDT has offered its duck tours in Boston for thirteen years and been the sole duck tour provider in Boston during that time, the concept of a "duck tour" well pre-dates BDT, and is far from unique to the Boston area. Duck tours are available all over the country in dozens of cities including San Francisco, Portland (Maine), Portland (Oregon), Baltimore, Wisconsin Dells, Waikiki, Oahu, Hot Springs (Arkansas), Branson (Missouri), Memphis, Philadelphia, Seattle, Chicago, Westerly-Pawtucket (Rhode Island). *See* Exs. 1, 2 to the Corley Aff. Indeed, more than a dozen duck tour companies worldwide use the identical phrase "duck tours" in their name: San Francisco Duck Tours, Hot Springs National Park Duck Tours, Duck Tours Miami, Pearl Harbor Duck Tours, Hawaii Duck Tours, Ketchikan Duck Tours, Captain Duck Tours, Harbour Duck Tours, London Duck Tours, Caribbean Duck Tours, Rotura Duck Tours, Paihia Duck Tours, Singapore Duck Tours, and Just Ducky Tours, and at least a dozen more companies offering duck tours around the country have a "duck"-formative name including: Original Wisconsin Ducks, Chattanooga Ducks, Austin Duck Adventures, DC Ducks, Dells Army Ducks, Ride the Ducks Baltimore, Ride the Ducks Memphis, Ride the Ducks Philadelphia, Ride the Ducks Branson, Albany Aqua Ducks & Trolleys, DivaDuck, and Downeast Duck Adventures. *See* Exs. 1, 2

to Corley Aff.[2]

While the Injunction appears to recognize that the term "duck" has become generic for an amphibious landing vehicle, there was also overwhelming evidence in the record showing the widespread generic use of "duck tours." This evidence included:

- <u>Plaintiff's own use.</u> BDT's own website in 2001 used the term duck tours by stating: "Contrary to local belief, the unique idea of a Duck Tour did not originate in Boston. Duck operations have been in existence in the Midwest for decades, and in fact, continue to thrive." The use of the term "duck tour" here is generic, to describe a "unique" type of tour, not plaintiff's brand of tour. Indeed, plaintiff went on to explain that "duck" operations had been around for years.

- <u>Third-party use.</u> While Court acknowledges evidence of numerous "duck tours" nationwide and 13 "duck tour" trademark registrations, the Court does not mention the further evidence of widespread third-party use of the "duck tour" term "for amphibious land/water tours." As presented in the Affidavits filed with the Opposition, the term "duck tours" has been used repeatedly in a legion of articles and websites in a generic, non-trademark, fashion. This includes use of the phrase "duck tours" in the press and among travel agencies alongside other generic categories of tourist attractions such as "trolley tours" and "harbor cruises." In short, quintessential use of the term to identify "what" and not "who" by disinterested third parties.

- <u>Plaintiff's Disclaimer.</u> The Order also appears to overlook that in obtaining its federal trademark registration for "Boston Duck Tours" for amphibious land/water tours, plaintiff disclaimed rights to the exclusive use of "duck tours."

The Court reasoned that "duck tours" is not generic because:

---

[2] In all, SDT's *very* preliminary internet investigation located at least 40 duck tours advertising on the internet, of which at least 36 could be verified as operational in the brief time SDT has had to conduct its investigation. *See* Corley Aff. at ¶ 3.

> The tour itself does not involve ducks, as creatures, in any way. Contrary to what the name "duck tours" may imply, the tour does not involve either duck watching or duck hunting. Thus, unlike "wool felt" or "crab house" in which the generic terms referred exactly to what the public would assume the words to mean, the link here is more attenuated.

Opinion at 11. SDT respectfully contends that this analysis is mistaken. Contrary to the District Court's reasoning, there was substantial evidence from plaintiff's own use, third party uses and plaintiff's own disclaimer that the public does recognize the "duck tours" term to refer to amphibious land/water tours. Indeed, there is no evidence of any use of the term "duck tours" as a tour involving duck watching or duck hunting, nor do any of the articles located by defendant use the phrase in any way *other than* to identify land-and-sea sightseeing tours.

Once "duck tours" is determined to be generic, plaintiff cannot succeed on its trademark claim. In that circumstance, the generic portion of the mark is to be ignored, leaving only a comparison of "Boston" and "Super." Where "respective marks have a common element which is generic, ... the court must look to the non-generic aspects of the marks" to determine if they are confusingly similar. *Donsky v. Bandwagon*, 1976 U.S. Dist. LEXIS 11735, *10-11 (D. Mass. Dec. 21, 1976). *See also Am. Cyanamid Corp. v. Connaught Labs, Inc.*, 800 F.2d 306 (2d Cir. 1986) (holding that there can be no infringement where the overlap between marks is limited to a generic term).

A highly analogous case, *Maine Avenue Seafood, Inc. v. The Crab House, Inc.*, 1998 U.S. Dist. LEXIS 23144 (D. Md. Mar. 30, 1998), is instructive here. In *Maine Avenue Seafood*, Bethesda Crab House challenged a competitor's use of the mark "THE CRAB HOUSE." While noting that "Bethesda Crab House" could constitute a protectable composite mark with a secondary meaning (i.e. as a geographic term combined with generic terms), the Court nonetheless culled out the "word[s] common to [both] designations [that were] generic, ... [and] focus[ed] [its] inquiry ... upon the confusing similarity of the non-generic portions." *Id.* at 17. The Court concluded that there was no non-generic portion of defendant's mark that could possibly infringe any protectable interest in plaintiff's mark, and thus, there was an "absence of protectable confusion." *Id.*

When a trademark contains generic words that are among the few that can accurately describe a service or product, to prevent others from using those words to describe the service or product would work to effectively create a monopoly not on the trademark, but on the entire service or product itself. That is not the point of the Lanham Act. *See, e.g., Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986) ("Imagine being forbidden to describe Chevrolet as a 'car' or an 'automobile' because Ford or Chrysler or Volvo had trademarked these generic words."); *Nat'l Nonwovens, Inc.*, 78 U.S.P.Q.2d at 1533 ("Public policy demands that generic terms be free for all to use and not susceptible to appropriation by one company. Allowing a trademark in a generic name is like granting a monopoly.").[3]

**Logo**

The Court's finding of a likelihood of confusion between the logos also is in error. First, there is no evidence of confusion based upon a similarity in the logos.

Second, the logos simply do not appear confusingly similar. The logos (which were submitted with the Opposition) are attached as Exhibit A hereto. They are extremely different with the only similarity being the existence of cartoon ducks splashing in the water. Unlike the Boston Duck Tours logo, the logo used by Super Duck Tours uses a duck with no hat, which wears a cape (consistent with defendant's superhero theme), is represented in a side view with a body made up of the amphibious vehicle. The logos do not look alike.

Third, where the only similarity in the logos is a result of the use of a cartoon duck, there is no infringement. As explained by Judge Ponsor in *National Nonwovens Inc. v. Consumer Products Enterprises, Inc.*, 78 U.s.P.Q.2d 1526 (d. Mass. 2005), where the generic term suggests a particular animal, using that animal in a logo is protected. The generic term there was "wool felt." The competing logos involved rams. As stated by the Court in that case:

---

[3] *See also Maine Ave. Seafood, Inc. v. The Crab House, Inc.*, 1998 U.S. Dist. LEXIS 23144 at *15 (D. Md. 1998) (rejecting affidavits showing customer confusion on grounds that the confusion appeared to result from secondary meanings of generic terms and noting that such confusion is *not* the kind of confusion protected by the Lanham Act).

> "The only significant shared element of the designs is their depiction of the same animal. If the product being marketed has no obvious connection to sheep, an independent decision by two companies to use the same animal to market their products might allow for an inference of similarity. Where, however, the underlying product is made from wool, a decision to portray a wood-producing animal in a logo is hardly surprising."

Thus, it is not surprising that the evidence before the Court showed that virtually every "duck tour" company in the country uses a cartoon duck for its logo. The injunction should not have issued.

**Actual Confusion**

The Court relied upon the existence of actual confusion in the market. This, however, does not take into account the difference between protectable trademark confusion and confusion from two parties using unprotectible generic terms to describe their products and services. The allegations of confusion proffered by BDT are insufficient to establish confusion protectable by the Lanham Act. As Professor McCarthy has warned,

> evidence of actual confusion must be viewed in its evidentiary context. Confusion may not be causally related to the use of similar marks at all. For example, the courts have sometimes characterized evidence of actual confusion as mere "secretarial carelessness caused by a failure to check business addresses," or due merely to " inattention and indifference," or that misdirected mail and phone calls are caused by "mere carelessness" of the post office or persons looking in the phone directory.

4 McCarthy on Trademarks and Unfair Competition § 23:13 (4th ed.) (internal footnotes omitted). BDT has done nothing to try and ascertain *why* the alleged incidents of confusion occurred, and thus has failed to show the form of confusion that gives rise to trademark liability. BDT utterly fails to consider the strong possibility that *some or all* of the alleged instances of confusion may be the result of consumer confusion between the *generic* elements of the parties respective marks (i.e., "duck tours") as opposed to the non-generic elements (i.e., BOSTON v. SUPER). As discussed above, confusion as to non-protectable words or phrase is not actionable.

Even where parties have submitted affidavits directly from so-called "confused" consumers, courts have nonetheless commonly struck affidavits submitted directly from consumers where the affidavits failed to distinguish between confusion resulting from the generic elements of a mark as opposed to confusion from the actual marks as a whole. For example, in *Maine Ave. Seafood, Inc.*,

A/72091934.1

1998 U.S. Dist. LEXIS 23144 at *15, the introduction of "The Crab House" restaurant a mile away from the "Bethesda Crab House" restaurant plainly resulted in widespread confusion; the court there properly rejected such confusion as evidence of any protectable trademark confusion. The court noted that there, as here, such evidence failed to provide any basis to distinguish between the meaning of the phrase at issue, "crab house," as a kind of restaurant versus the meaning of "crab house" as a specific reference to the Bethesda Crab House. *Id.*; *see also Pilot Corp. of Am. v. Fisher-Price Inc.*, 73 U.S.P.Q.2d 1030, 1037 (D. Conn. 2004) (finding evidence of actual confusion insufficient where the internal control of a survey failed to account for the possibility that respondents could have relied on non-protected similarities between the two marks, such as similar colors); *Sharper Image Corp. v. Target Corp.* 425 F. Supp. 2d 1056, 1074 (N.D. Cal. 2006) (in trade dress infringement case where there was a "range of generally similar products on the market," court found plaintiff's evidence of actual confusion to be de minimis, and "not probative of confusion based on trade dress" given that "consumers could easily become confused based on generic similarities shared by the other nineteen" similar products on the market.).[4] BDT has failed to enable any determination as to the source of the

---

[4] *See also Simon Prop. Group L.P. v. mySimon, Inc.,* 104 F. Supp. 2d 1033 (S.D. Ind. 2000). There, the court refused to admit a survey purporting to show actual confusion on the internet in a trademark infringement suit between "Simon" and "mySimon" on grounds that it failed to "include adequate controls that take into account the fact that the name 'Simon' is used extensively on the Internet for commercial purposes" and that the survey would "disregard entirely the fact that other businesses, including other large and relatively well-known ones, use 'Simon' as part of their names on the Internet and could also be confused with [defendant]." *Id.* at 1045-46. The court ruled that:

> Evidence that an Internet user is confused by a search engine's collection of many "Simon" sites would not show that SPG is entitled to relief against all other Simon sites. SPG does not and could not claim to have exclusive rights to the name "Simon" on the Internet. **A user who is equally confused by mySimon, by "Simonsays," and by other Simon sites does not show legally relevant confusion. SPG must show there is something different about mySimon that makes it more confusing than a level of perhaps inevitable confusion based solely on the name.** On the other hand, if use of a proper control showed that consumers have no trouble distinguishing most "Simon" sites from one another, then SPG would have taken a long step toward showing that any confusion between its site and mySimon's site was a result of legally relevant confusion.

*Id.* at 1047 (emphasis added). Similarly, the evidence submitted by BDT fails to distinguish the legally irrelevant confusion -- that attributable to the generic "duck tours" portion of the mark -- from legally relevant confusion -- that between "Boston" and "Super."

confusion and whether it is of the type protected by the Lanham Act, and therefore BDT's allegations of "actual confusion" should be given little, if any, weight.

Moreover, there is no basis to determine whether any allegation is the result of actual trademark confusion as opposed to the confusion inherent when a new, second player enters a market that had previously been serviced by a single player. Given that BDT has had a monopoly on duck tours in Boston for over a decade, a certain amount of temporary confusion is to be expected now that there is a new player. *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1167 (11th Cir. 1982) ("[s]hort-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight."). "[E]ven several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion." *Duluth News-Tribune v. Mesabi Pub. Co.,* 84 F.3d 1093, 1098 (8th Cir. 1996); *see also Astra Pharmaceutical Prod. Inc. v. Beckman Instruments Inc.*, 718 F.2d 1201, 1207-08 (1st Cir. 1983) (temporary confusion regarding the association of salesmen from the plaintiff's company with the defendant was insufficient to raise a genuine issue of material fact, especially where there was no evidence of any actual purchases that resulted from the confusion). To put defendant through the potentially business-ending task of completely changing its name and logo only to find out afterward that the real source of confusion was the generic word "duck" or the mere existence of two providers of a unique service where only one had been for over a decade is the picture of inequity, and demonstrates the impropriety of the injunction as granted. Indeed, when viewed in light of the fact that BDT has enjoyed a monopoly on the duck tour industry in Boston, the bulk of the instances of alleged confusion (i.e. calling the wrong ticket office, arriving at the wrong launching place or at the incorrect time) reveal the mistaken assumption of customers that there is only one duck tour in town; not that the customers were confused by the mark SUPER DUCK TOURS. "[C]onfusion resulting from the consuming public's carelessness, indifference, or ennui will not suffice." *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO*, 103 F.3d at 201.

Finally, the possibility of confusion is minimized by the actions that SDT has undertaken to distinguish itself from BDT. For example, SDT has posted on its website in at least two places disclaimers that read: "Not to be confused with Boston Duck Tours." *See* Kraez Aff, Ex. 2. Likewise, SDT has recently posted signs at its own ticket booth, and instructed Discover Boston to posts signs at

its ticket booths, which state that "Super Duck Tours is <u>not</u> affiliated with Boston Duck Tours." *See* Kraez Aff. at ¶ 30 (emphasis on actual signage).

Simply put, BDT has not proffered any meaningful or admissible evidence of actual confusion and therefore this factor, like the others, demonstrates that the junction was granted in error.

B.  The Injunction Threatens SDT with an Immediate Risk of Irreparable Harm.

In its Opposition, SDT set forth in detail the immediate and irreparable harm that will result from the Injunction. Opposition at 28-29. It is undisputed that the effort and expense of undoing its logo from every piece of advertising, vehicles, fliers, signs, t-shirts and other merchandise will, alone, be monumental. After a heavy and long-term investment to get the Super Duck Tour venture operational in Boston, a stop-order now, at the height of the tourist season, would impose a financial burden from which SDT may never recover. *Id.* at 29. Further, even if SDT survives financially from such an immediate name change, the practical reality that such a change at this stage will essentially be permanent, depriving SDT of meaningful relief. Indeed, "failure to grant a stay will entirely destroy [SDT's] rights to secure meaningful review." *Providence Journal*, 595 F.2d at 890 (granting stay pending appeal). An ultimate victory on the merits will be no vindication if SDT is forced out of business during the pendency of the case.

By contrast, the evidence of harm to the plaintiff, which waited for years to assert its claim, and by its own admission turns away hundreds of customers a day during the summer season, is minimal. In this case, because the likely harm that SDT will suffer during the pendency of the case greatly outweighs any alleged harm the plaintiff could possibly suffer during that same time, a stay pending appeal is particularly appropriate. *See Devcon*, 455 F.2d at 832 (granting stay pending appeal, where plaintiff could not show that the destruction of its mark would occur during the relatively short duration of a case); *see also Providence Journal*, 595 F.2d at 890 (granting stay pending appeal where injunction would destroy status quo and appellant's chance to secure meaningful review, but stay of injunction would only minimally harm appellee).

B.  In the Alternative, the Court Should Issue a Temporary Stay to Permit the orderly resolution of a Motion to Stay in the Court of Appeals.

If the Court declines to stay the Injunction pending SDT's appeal, SDT respectfully requests that, at a minimum, the Court issue a temporary stay to permit the orderly resolution of a motion to

stay to be filed in the Court of Appeals.  *See also Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 105 F.3d 837, 838, 840 (2d Cir. 1997) (cautioning district courts to be aware of the consequences to the parties of refusing to grant a temporary stay to permit a party to seek stay relief in the Court of Appeals).  Such an order, which by its nature is of limited duration, cannot be said to have any meaningful impact on the plaintiff but would ensure that SDT will not have been unnecessarily harmed the peak of the summer tourist season if the First Circuit stays the injunction.

I.  CONCLUSION

For the foregoing reasons, this Motion should be allowed.

Respectfully submitted,

**SUPER DUCK TOURS, LLC,**

By its attorneys,

/s/ Joshua M. Dalton, BBO #636402
Victor H. Polk, Jr., BBO #546099
Ralph C. Martin, II, BBO #322660
Joshua M. Dalton, BBO #636402
Lawrence T. Stanley, Jr., BBO #657381
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
617.951.8000

Dated: July 13, 2007

A/72091934.1

## **CERTIFICATE OF SERVICE**

   I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 13, 2007.

                    /s/ Joshua M. Dalton_____
                    Joshua M. Dalton, BBO #636402

A/72091934.1